CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 13 2021

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| VARIETY STORES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:19cv00031 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MARTINSVILLE PLAZA, LLC., | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

On May 18, 2018, after several hours of torrential rain, the roof of the Rose's department store in Martinsville, Virginia, collapsed. When it collapsed, a remarkable amount of water flooded into the store. Portions of the roof also struck a Rose's employee, Trevia Dillard, who thankfully survived but suffered serious injuries. Witnesses at the scene described water up to their knees at the time of the collapse and standing water up to three inches deep the next day. The owner of the store, Plaintiff Variety Stores, Inc. ("Variety"), later determined that the collapse destroyed more than $80,000 in inventory and that the costs of salvaging the store were roughly $300,000. (*See* ECF No. 65 at 3.)

Variety has now sued its landlord, Defendant Martinsville Plaza, LLC ("Martinsville"), to recover those costs, as well as other, unrelated expenses stemming from the replacement of six HVAC units after two of the units had failed and the others were in a state of disrepair. After developing a voluminous factual record, the parties have now filed cross-motions for summary judgment.

# I.    BACKGROUND

In August of 1986, Variety entered into a lease with Martinsville to rent a building for a Rose's Department Store.[1] Over the years, the lease was amended and extended, and the parties do not dispute either the applicability of the lease to their relationship or its operative language. They do, however, disagree on the meaning of certain language in that lease.

The rain that fell in Martinsville, on May 18, 2018, was what some describe as coming from a "100-year storm," owing to the rarity of such a massive rainfall in a relatively short period of time—such a thing happens, on average, once every 100 years.[2] Following the collapse, Variety demanded that Martinsville cover its costs based on an indemnification clause in the lease for the store. Martinsville refused, claiming the collapse was caused by "tenant neglect," a carveout in the indemnity provision. This set the parties off on a quest to determine why the roof collapsed and who was responsible for the damages. In their search for answers, the parties sought the opinions of three experts: Nicholas Steinert, an engineer who visited the store two days after the collapse (well before the threat of litigation materialized); David Willers, an engineer who visited the site at Variety's behest; and Nichols Wijtenburg, an engineer hired by Martinsville to review the evidence and rebut Willers's report. As a general matter, all of the experts agreed that the roof collapsed because the drainage was insufficient to handle the rain that fell on May 18, 2018. (*See generally* ECF No. 82-6; ECF No. 82-12; ECF No. 82-64.)

---

[1] The 1984 lease was between Variety's predecessor in interest, Rose's Stores Inc., and Martinsville's predecessor in interest, Melvin Simon & Associates, but the court will simply refer to the original parties by their current names.

[2] U.S. Geological Survey, "The 100-Year Flood," *available at* www.usgs.gov/special-topic/water-science-school/science/100-year-flood (last visited April 11, 2021).

Based on Wijtenburg's report, Martinsville takes the position that the insufficient drainage was the result of construction done by Rose's Stores, Inc. (Variety's predecessor in interest) in 1984. (*See* ECF No. 93 at 17–19; ECF No. 82-7 at 4.) In 1984, after Rose's entered into a lease for the store, someone (records are unclear) constructed a parapet wall (a wall which extends above the roof) on the rear of the building. The building already had parapet walls on the front and sides, so the fourth parapet wall effectively enclosed the roof. Martinsville believes that Rose's constructed the wall, rendering the drainage on the roof insufficient and causing its eventual collapse. Variety maintains that the drainage on the roof was Martinsville's responsibility for a number of reasons, discussed in more detail below. The disagreement over the cause of the roof collapse—and therefore whether Martinsville is obligated to indemnify Variety—is the first dispute in this case. Variety's suit alleges that Martinsville is contractually obligated to indemnify it for losses occasioned by the roof collapse or, alternatively, that Martinsville breached a common law duty to maintain the roof in safe condition.

The second dispute also concerns damages from the collapse but does not arise under the indemnification provision of the contract. As noted above, Trevia Dillard, a Variety employee, was injured in the collapse. As a result, Variety has made worker's compensation payments to Ms. Dillard, as required by Virginia law. Variety seeks damages from Martinsville in the amount of those payments under two legal theories: (1) a common-law negligence subrogation claim on behalf of Ms. Dillard; and (2) a breach of contract action alleging that the collapse was the result of Martinsville's failure to maintain the roof or, alternatively, that

Variety's payments to Dillard are the result of Martinsville failing to carry liability insurance. (*See* ECF No. 58.)

The final dispute is largely unrelated to the roof collapse. Several months after the collapse, on October 1, 2018, Variety notified Martinsville that it believed the six HVAC units in the Rose's store needed to be replaced in order for the store to reopen after the roof collapse, and that Variety believed the lease obligated Martinsville to pay for their replacement. (*See* ECF No. 82-16.) At the time Variety notified Martinsville of the need for replacement, two of the six units were inoperable and two were in serious need of repair. (*See* ECF No. 82-20 at 1.) The only option for repairing the four broken units was to obtain specially manufactured parts that would not be covered by any warranty.[3] (*See* ECF No. 82-60 at 20–21.) But Martinsville refused to pay, so Variety reopened the store using only the two properly working HVAC units. Two months after reopening, however, Variety paid to replace all six units. It now alleges that Martinsville breached the lease by failing to pay for replacement of the units. Importantly, this claim is unrelated to the indemnification clause in the contract or the events related to the roof collapse. (*See* ECF No. 65.)

The procedural history of the case is convoluted. Variety's initial suit against Martinsville did not contain any claims related to Dillard's worker's compensation payments. Those claims were brought in a separate suit[4] that was consolidated with this one. As a result,

---

[3] Because the units were 20–30 years old, the parts needed for repair where no longer being manufactured. Variety alleges it could have had the parts machined, but there would be no guarantee that they would work or last for any length of time. As a result, Variety contends replacement was the only viable, commerically reasonable option.

[4] The suit concerning worker's compensation benefits paid by Variety to Ms. Dillard was originally brought in state court and removed to this court.

- 4 -

there are two operative complaints in this case: the Amended Complaint (ECF No. 58), which contains the worker's compensation claims, and the Third Amended Complaint (ECF No. 65), which contains the indemnification, non-subrogation common-law negligence, and HVAC claims.

The parties have now filed cross-motions for summary judgment on these complaints. Variety filed a partial motion for summary judgment, seeking summary judgment on the indemnification and HVAC claims, as well as on Martinsville's affirmative defenses of failure to mitigate, improper notice of breach, and lack of notice of defect. (*See* ECF No. 83.) Martinsville filed two motions for summary judgment, one for each complaint. It seeks summary judgment on all claims. (*See* ECF Nos. 85, 93.)

For the reasons stated herein, the court will grant in part and deny in part all three motions for summary judgment. With respect to Martinsville's motions, the court will grant summary judgment to Martinsville on Variety's common-law negligence and HVAC claims. Landlords in Martinsville's situation do not have a common-law duty to repair or maintain a roof, and Variety has failed to present a genuine issue of material fact with respect to Martinsville's contractual obligation to replace the six HVAC units. With respect Variety's motion, the court will deny it as to all claims except Martinsville's affirmative defenses, which Martinsville has forfeited.[5]

---

[5] Martinsville did not respond to Variety's motion for summary judgment on its affirmative defenses. (*See generally* ECF Nos. 85, 93, 101, 103, 104.) It has therefore waived them. *See Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Because there remain genuine issues of material fact regarding the cause of the roof collapse—and therefore whether Martinsville breached its contractual obligations with respect to the roof and is required to indemnify Variety—the court will deny summary judgment to both parties on the contractual claims related to the roof collapse.

## II.   SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an

'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III.   ANALYSIS

### A. Common Law claims

Variety brings two common law negligence claims: a subrogation claim on Dillard's behalf and a claim that Martinsville violated its common-law duty to maintain the roof and other structural portions of the Rose's Store in a reasonably safe condition. Because Martinsville did not owe Variety or Dillard any common-law duties with respect to the

condition of the structure, the court will grant summary judgment to Martinsville on both claims.

Virginia common law does not impose any duty of maintenance or repair on landlords where a tenant has possession and control of the premises. *See Wohlford v. Quesenberry*, 523 S.E.2d 821, 821 (Va. 2000) ("[T]he common law rule [is] that a tenant who has exclusive possession and control of a premises, absent an agreement to the contrary, is responsible for its maintenance and repair."); *Seoane v. Drug Emporium, Inc.*, 457 S.E.2d 93, 96 (Va. 1995) ("In the absence of an express agreement, the landlord had no common-law or statutory duty to maintain, repair, or replace either the roof or the heating and air conditioning units."); *Sanders v. UDR, Inc.*, No. 3:10-CV-459, 2011 WL 127148, at *4 (E.D. Va. Jan. 12, 2011).

Variety attempts to resist this conclusion by citing several Virginia court cases, but none apply here. All of the cases it provides address landlords in control of premises, invitees of landlords, or common areas in multi-tenant buildings. *See Gumenick v. United States*, 193 S.E.2d 788 (Va. 1973) (landlord in control of premises); *Love v. Schmidt*, 389 S.E.2d 707 (Va. 1990) (common area); *Wagman v. Boccheciampe*, 143 S.E.2d 907 (Va. 1965) (same); *Atlantic Rural Exposition, Inc. v. Fagan*, 77 S.E.2d 368 (Va. 1952) (invitee of landlord); *Revell v. Deegan*, 65 S.E.2d 543 (Va. 1951) (common area). Variety does not allege—and the record does not reveal—that Martinsville was in control of the Rose's store or that any of the relevant events occurred in a common area accessible by or available to other tenants. Therefore, the default common-law rule applies, and Martinsville did not owe Variety any common-law duty to repair or maintain the premises. Any claim Variety may have against Martinsville based on the roof collapse must lie in contract.

Likewise, Martinsville did not owe Dillard any common-law duty. Landlords in Virginia, like Martinsville, owe their tenant's invitees the same duties they owe the tenants themselves. *See* St*eward ex rel. Steward v. Holland Fam. Properties, LLC*, 726 S.E.2d 251, 254 n.2 (Va. 2012). Invitees and guests "stand in the tenant's shoes" and may only assert claims based on the landlord's duties to the tenant. *Oliver v. Cashin*, 65 S.E.2d 571, 572 (Va. 1951). This means that Variety's common-law subrogation claim must suffer the same fate as its common law claim on its own behalf. As a subrogee, Variety stands in Dillard's shoes, which, through the machinations of Virginia law, are actually its own shoes. And, as discussed, Variety has no common-law claim against Martinsville. Because Martinsville owed no common-law duty to Variety or Dillard, summary judgment will be granted to Martinsville on both common-law claims.

## B. Contract Claims

Variety brings two claims under the lease: a claim for the cost of replacement of six HVAC units in its store, and a claim for indemnification with respect to its damages caused by the roof collapse. Because Variety has not produced evidence sufficient to create a genuine issue of material fact with respect to replacement of the HVAC units, summary judgment will be granted to Martinsville on that claim. Because there are genuine issues of material fact with respect to the cause of the roof collapse, the court will deny both parties' motions for summary judgment on the indemnification claim.

i.     The HVAC Claim

Variety claims that Martinsville breached the lease when it failed to replace the HVAC

system in Variety's store after the roof collapse. Resolution of this claim turns on interpretation

of Sections 7, 8(a), and 8(c) of the lease, which read:

> Section 7, "MAINTENANCE BY TENANT." Tenant shall
> make all necessary nonstructural repairs, including plate glass, the
> maintenance of the electrical, plumbing, heating and air
> conditioning systems and equipment. In the event any repairs are
> necessary as a result of damage or destruction by fire, the
> elements, casualty or by the Landlord's negligence, default or
> failure to make repairs, the Landlord shall promptly make such
> repairs [to] all walls, the ceiling, and all doors.

> Section 8(a), "MAINTENANCE BY LANDLORD." The
> Landlord shall at all times maintain and keep in good repair the
> roof, structural walls, floor (excluding floor covering), and all
> structural portions of the building, and shall make such interior
> repairs and replacements which may be necessary as a result of
> damage or destruction by fire, the elements, casualty or
> Landlord's negligence, default or failure to make repairs.
> Landlord shall also promptly make all repairs or replacements
> (other than those to be made by Tenant) which may be necessary
> to maintain the demised premises in a safe, dry and tenantable
> condition and in good order and repair.

> Section 8(c), "MAINTENANCE BY LANDLORD." Prior to
> Tenants [sic] opening, Landlord will put all HVAC in proper
> working order. Tenant will be responsible thereafter.

(ECF No. 82-2 at 6.) The parties disagree over the proper interpretation of these three

provisions. Variety argues that Section 7 and Section 8(a), when read together, require

Martinsville to make all HVAC replacements. It asserts that use of the disjunctive "repairs or

replacements" in Section 8(a) implies that the term "repairs" as it used elsewhere in the lease—

such as in Section 7—does not include replacements. Additionally, Variety believes that the

HVAC units are necessary for the Rose's Store to be "safe, dry and tenantable," and therefore

- 10 -

their replacement falls under the landlord's maintenance duties as described in Section 8(a). To support this proposition, it points to the Virginia Uniform Statewide Building Code, which requires that occupied nonresidential structures have heating. *See* 13 VAC 5-63-310; 13 VAC 5-63-540. Variety argues that this regulation renders HVAC units necessary for the store to be "tenantable," and replacement of the units therefore falls under Section 8(a) of the lease and is Martinsville's responsibility.

Martinsville responds that Sections 7 and 8(c) unambiguously requires Variety to perform any HVAC replacement. It asserts Section 7 places the burden of replacing the HVAC units on Variety when it says, "Tenant shall make all necessary nonstructural repairs, including plate glass, the maintenance of the electrical, plumbing, heating and air conditioning systems and equipment." Martinsville argues that HVAC replacement is a "necessary nonstructural repair" and therefore the responsibility of the tenant under Section 7 of the lease. (ECF No. 93 at 6.) It further argues that this interpretation is bolstered by Section 8(c), which clarifies that Variety is responsible for the HVAC units after Martinsville fulfills its initial duty to put them in proper working order. (*See id.* at 8.) Because it believes these provisions allocate the responsibility to replace the HVAC units to Variety, Martinsville argues that HVAC replacement falls under the "other than those [repairs and replacements] to be made by Tenant" language in Section 8(a), and therefore the court need not resolve whether the HVAC system is necessary for the space to be "safe, dry and tenantable."

The court concludes that both parties are correct in some respects, but the issue turns on a failure of proof, not a contractual interpretation. Under any valid reading of the contract, Martinsville is only required to replace the HVAC units if doing so is "necessary" for the

premises to be tenantable. But Variety has failed to come forward with sufficient evidence to create a genuine dispute of material fact with respect to whether new HVAC units were "necessary" for the Rose's to be tenantable, and therefore its claim cannot survive summary judgment.

Insofar as the lease allocates responsibility for replacing HVAC units, it places the duty on Martinsville. The use of the disjunctive phrase "repairs or replacements" in Section 8(a) implies that Variety's duties to repair under Section 7 do not include duties to replace. Any other reading would render the words "or replacements" entirely duplicative, and Virginia contracts are presumed *not* to used superfluous terms. *See Ames v. Am. Nat'l Bank*, 176 S.E. 204, 216–17 (Va. 1934) ("The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition."). Additionally, the common meaning of the word "repair" does not include wholesale replacement, as the Virginia Supreme Court noted when facing an almost identical dispute. *See Seoane v. Drug Emporium, Inc.*, 457 S.E.2d 93, 96 (Va. 1995). Also of note, the difference in terminology does not seem to be an accident in this contract. Section 7, which details the tenant's duties, only ever uses "repair" or "repairs," while Section 8(a), which details the landlord's duties, only uses "repairs or replacements."

But Section 8(a)'s requirement that Martinsville replace HVAC units is conditional. Most importantly for this case, the lease only requires Martinsville to replace an HVAC unit if doing so is "necessary to maintain the . . . premises in a safe, dry and tenantable condition and in good order and repair" (hereinafter "tenantable"). Variety does not contest that this condition applies to Martinsville's duty to replace the HVAC units and agrees that Martinsville

need only make those replacements required to render the store tenantable. (*See* ECF No. 83 at 17–22.)

By extension, Martinsville is only liable in this case to the extent that new HVAC units were necessary to render the store tenantable. Because Martinsville's contractual duty to replace the HVAC units was subject to a condition—the replacement must have been necessary to render the store tenantable—Variety is obligated to produce some evidence that this condition was met in order to survive summary judgment. Without such evidence, no jury could find that Martinsville had a duty to replace the HVAC units. Put another way, if there is no triable issue with respect to whether new HVAC units were necessary for the store to be tenantable, there is no triable issue as to whether Martinsville is liable for the costs of the new HVAC units. Thus, Variety's claim depends, as a matter of law, on its ability to prove that replacing the HVAC units was necessary for the store to tenantable.

Variety has not produced any such evidence. The only relevant evidence indicates that the store was tenantable *before* the units were replaced. Variety seeks indemnification for replacement of six HVAC units, but at the time the roof collapsed, there were only four operable HVAC units servicing the store. (*See* ECF No. 82-20.) Moreover, both parties agree that Variety was able to reopen the store in November 2018 and keep it open for two months utilizing only *two* of the pre-replacement units. (*See* ECF No. 97 at 12.) After the store operated for two months on those two units, Variety demanded that Martinsville pay for six new HVAC units and, when Martinsville refused, purchased the units itself and brought this suit. Variety has produced no evidence that the existing HVAC units were insufficient to meet Martinsville's legal obligations, provide a comfortable shopping experience, or otherwise aid

in the running of the store at the time of replacement. In fact, Variety all but admits that the store was tenantable with only two working units. In its response to Martinsville's motion for summary judgment, Variety says:

> Ultimately, the parties were able to get the store at least back to being reopened with only the two units (the record is devoid of there being discussion amongst the parties of whether two units would be enough to satisfy Virginia's OSHA standards or patron expectations). The point here, though, is that **some HVAC was necessary** for the store to reopen, i.e., for the space to be tenantable.

(ECF No. 97 at 12–13 (emphasis in original).) Instead of contesting that any particular number of units are necessary for the building to be tenantable, Variety argues that because some HVAC—HVAC in the abstract, perhaps—is necessary for the store to be tenantable, the lease places the obligation for replacement of any and all units at any time on Martinsville. This argument is belied by the plain language of the contract. Section 8(a) states "Landlord shall also promptly make all repairs or replacements (other than those to be made by Tenant) *which may be necessary to maintain the demised premises in a safe, dry and tenantable condition* and in good order and repair" (emphasis added). The phrase "which may be necessary to maintain the demised premises in a safe, dry and tenantable condition" in this clause clearly refers to "repairs and replacements." In other words, it is the particular repair or replacement that must be necessary for the space to be tenantable, not the thing being repaired. The fact that HVAC as an abstract concept is necessary for the store to be tenantable does not place the duty of replacement—at Variety's whim—on Martinsville. It is the particular replacement at issue that must be necessary.

Variety's failure to produce evidence that HVAC replacement was necessary for the store to be tenantable is notable in light of the court's prior opinion in this case. The court, in an opinion issued before discovery, specifically held that liability for HVAC replacement would turn on what constituted a "dry and tenantable condition." (*See* ECF No. 28 at 8.) Variety was fully aware that the dispositive question on this issue was whether new HVAC units were necessary for the store to be tenantable, but it was unable to present any evidence that the store was not tenantable without new HVAC units.[6] Without such evidence, there is no genuine issue of material fact with respect to the HVAC claim.

In summary, both parties agree that Martinsville is only liable for the HVAC replacement if it was necessary for the store to be tenantable. There is no evidence in the record indicating that new HVAC units were necessary for the store to be tenantable, and therefore there is no genuine issue of material fact as to whether Martinsville is liable for the cost of HVAC replacement. Martinsville is therefore entitled to summary judgment.

ii.   <u>The indemnification claim</u>

Variety's second claim under the lease is that Martinsville is contractually obligated to indemnify it for all damages suffered as a result of roof collapse. The parties have filed cross motions for summary judgment on this claim. Because there remain genuine disputes of material fact with respect to all dispositive issues on this claim, summary judgment will be denied to both parties.

Section 18(d) of the lease provides as follows:

---

[6] Given the skilled and zealous advocacy by counsel throughout these proceedings, the court is left to speculate that the primary reason for this is that such evidence simply did not exist.

> The Landlord agrees to indemnify and hold the Tenant harmless
> from and against all loss, damage, or injury to the Tenant's store
> and to the Tenant's merchandise, fixtures or other property
> therein, due to or occasioned by any overflow or leakage or defect
> of exterior walls or roof . . . provided that such defect is not
> caused by Tenant's neglect.

(ECF No. 93-1 at 11.) Variety argues that this indemnification language obligates Martinsville to pay for the damages resulting from the May 18, 2018, roof collapse. It contends that the evidence in the record definitively establishes that the roof collapse was caused by myriad factors, including excessive water accumulating on the roof on May 18 due to inadequate drainage, and structural decay caused by regular episodes of water accumulation and intrusion in the years prior to 2018. Variety's theory of liability is primarily established by its expert, David Willers, a civil engineer, as well as the deposition testimony of Nicholas Steinert, a professional engineer Martinsville hired to conduct a preliminary inspection of the building the day after the collapse (but whom Martinsville did not notice as an expert witness).

Although Martinsville concedes that improper water drainage and standing water on the roof were likely causes of the collapse, it puts the blame for these problems squarely on Variety. Specifically, Martinsville argues that Variety constructed a parapet wall along the northeast side of the building's roof in 1984, effectively enclosing the almost-flat roof within four walls. Because the original pitch of the roof sloped slightly downward towards this side of the building, Martinsville claims that Variety's later parapet addition served as a defective barrier, impeding water from draining through the original drainage system. Martinsville adds that Variety failed to redesign and install a new drainage system to account for this material roofing alteration and its deleterious effects on water drainage. All of this, Martinsville contends, establishes that the roof collapse was caused by "tenant's neglect," such that it is

not obligated to indemnify Variety for losses associated with the roof collapse. Martinsville's dueling theory of liability is primarily established through the expert testimony of its civil engineer, Nicholas Wijtenburg.

Although the plain and unambiguous terms of Section 18(d) establish that Martinsville has a contractual indemnity obligation, there are genuine issues of material fact related to Variety's purported construction of the parapet in 1984 and whether the addition of that parapet caused, or contributed to, drainage problems leading to the 2018 roof collapse. If Variety is responsible for the parapet's construction, and that construction was negligent or defective, Martinsville is not obligated to indemnify it under the lease.

Variety first argues that there is insufficient evidence in the summary-judgment record from which a factfinder could conclude or infer that its predecessor in interest, Rose's Stores, Inc., constructed the parapet. According to Variety, although it is undisputed that the parapet at issue was not part of the store's construction in 1966, Martinsville has not established that Rose's constructed the parapet wall in 1984, around the time the lease was signed, or at any time thereafter. This is belied by the record.

Neither party was able to locate a percipient witness to the 1984 lease negotiations or the purported construction of the parapet at or around that time. But Martinsville relies on five pieces of documentary evidence to support its assertion that Rose's, rather than Martinsville's predecessor in interest, Melvin Simon & Associates, Inc., was responsible for the parapet's installation around the time the lease was signed: (1) a June 4, 1984, letter from an executive of Melvin Simon & Associates to an executive at Rose's memorializing their recent negotiations and purported agreement about the terms of a lease; (2) a set of technical

drawings from Rose's Store Planning Department showing, among other things, the construction of a parapet; (3) a September 25, 1984, building permit issued by Henry County, Virginia, to Rose's authorizing, among other things, "rework [sic] canopy brick rear of Bld."; (4) a promissory note and construction-loan agreement dated August 1984, referring to the recently signed lease between Melvin Simon & Associates and Rose's and outlining terms for a construction loan from Melvin Simon & Associates to Rose's for "certain improvements to the Shopping Center and the Leased Premises"; and (5) a February 15, 1985, letter from a Rose's executive to Martinsville Plaza, Inc. (the Melvin Simon & Associates entity that owned the Rose's building) acknowledging receipt of the construction loan proceeds and its obligation to repay that loan in monthly installments.

In sum, these records and correspondence—all of which relate to the negotiation and execution of the original lease and attendant improvements made by (or at least at the direction of) Rose's—support Martinsville's theory that Variety's predecessor in interest constructed the parapet in 1984. First, the loan documents and correspondence between executives from both companies establish that Rose's bargained for the right to make improvements and subsequently arranged for the construction of those improvements at the time it entered the lease. (*See* ECF No. 101-1, ECF No. 93-6.) Second, the contemporaneous technical drawings bear the mark of Rose's Planning Department and detail the construction of a parapet wall, leading to the reasonable inference that the parapet wall was erected as part of this improvement process. (*See e.g.,* ECF No. 82-8 at 25.) This conclusion is corroborated by the building permit referencing work on the "canopy brick" at the rear of the building. (ECF No.

- 18 -

82-37.) The parapet itself, as Variety concedes, is partially made of bricks, and the rear of the building is its north side.

Variety pushes back on this logic, arguing that the linchpin of Martinsville's evidentiary foundation—the technical drawings—have not been authenticated and are inadmissible hearsay. These arguments are unavailing.

The court concludes that the drawings, even though they are not "stamped by a licensed engineer or architect," are sufficiently authenticated. Under Federal Rule of Evidence 901, the proponent of a document must offer sufficient evidence to support a finding that the document is what its proponent claims it to be. Section (b) of Rule 901 provides a non-exhaustive list of ways the proponent may provide authenticity, including "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Ultimately, a party seeking to admit an exhibit—either for purposes of a summary judgment record or at trial—"need only make a prima facie showing that it is what he or she claims it to be," which is not "a particularly high bar." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 542 (D. Md. 2007). The drawings at issue clear this low bar. First, each page bears the mark of Rose's Planning Department on the bottom right corner. (*See* ECF No. 82-8 at 24–30.) Second, the drawings are dated June 1984, around the time that the lease was signed. Third, writing on the drawings indicate that the design itself pertains to a Rose's store in Martinsville, Virginia. Fourth, the drawings themselves depict, without question, the building that is the subject of the lease (and this lawsuit).

And these drawings—as well as the detail descriptions contained therein—are not inadmissible hearsay. Although it is axiomatic that the hearsay rule bars the admission of out-of-court statements offered for the truth of the matter asserted, "excepted from the definition of hearsay are communications that have 'independent legal significance.'" *Milbourne v. JRK Residential Am., LLC*, No. 3:12cv861, 2016 U.S. Dist. LEXIS 33588, at *18 (E.D. Va. March 14, 2016) (quoting *Lorraine*, 241 F.R.D. at 566). A communication is not offered for the truth of the matters contained therein "if the significance of an offered statement lies solely in the fact that it was made." Fed. R. Evid. 801 Advisory Committee's Note to Subdivision (a). If the out-of-court statement actually "affects the legal rights of the parties, or where the legal consequences flow from the fact that the words were said[,]'" the statement itself falls into the exception. *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087 (10th Cir. 2001). "In the most general terms, statements of independent legal significance form 'a part of the details of the issue under substantive law and the pleadings[.]'" *Jude v. Health Mgmt. Assoc. of W. Virginia, Inc.*, 187 F.3d 629, 1999 U.S. App. LEXIS 18427, at * 5 (4th Cir. 1999) (quoting *Wigmore on Evidence* § 1770 (3d ed. 1940)). The most common examples of communications that do not constitute hearsay because they have independent legal significance are words or documents associated with the formation of contract, marriage vows, insurance proofs, legal notices, and defamatory statements, but this list is not exhaustive.

The court concludes that the primary significance of the 1984 drawings is that they were purportedly created by or at the direction of Variety's predecessor in interest, Rose's. In other words, Martinsville relies on them not to prove the literal truth of the complex design schematics depicted and explained therein, but to show that Rose's, and not its predecessor in

interest, was primarily responsible for the design and construction of the improvements, including the parapet, in the first instance. Alternatively—that is, even if they do not have independent legal significance—these drawings, to the extent they bear the standard mark of Rose's Planning Department on the bottom corner of every page, constitute admissions by a party opponent, either because they were made by Rose's or its agent, or because Rose's adopted them around the time the lease was executed.[7] *See* Fed. R. Evid. 801(d)(2). Martinsville, in short, can rely on these documents for purposes of arguing for and against summary judgment (and at trial).

In sum, the documents related to the 1984 lease negotiations and improvements are admissible and sufficient to create a genuine issue of material fact as to whether Variety, through its predecessor in interest, was responsible for construction of the parapet. These documents do not establish this fact conclusively in Martinsville's favor, but they provide a sufficient factual basis upon which a jury could so find.

Variety makes several arguments in support of the position that, even if its predecessor in interest Rose's was responsible for the construction of the parapet in 1984, Martinsville's knowledge of this fact and its role in providing roof maintenance over the next 35 years effectively vitiates any negligence on its part related to the original parapet design and construction. None of these arguments is persuasive—at least at the summary-judgment stage.

---

[7] Although Variety does not challenge the admissibility of the other four documents, the court notes that they are admissible. The note and loan agreement, as well as the correspondence related to the lease negotiations and terms, are statements of independent legal significance, forming a "part of the details" of the contract at issue (i.e., the lease agreement). Wigmore on Evidence § 1770.

First Variety contends that Martinsville had knowledge of and approved the parapet installation in 1984. In support, Variety points to the fact that the draft drawings bearing the Rose's mark were also stamped "received by" Melvin Simon & Associates and were maintained in Martinsville's files.[8] Because Martinsville's predecessor in interest received Rose's plans at some point, Variety argues, Martinsville must have approved the parapet design. Variety further argues that Martinsville would have had to approve the plans because Rose's did not own the building. But there is insufficient evidence in the record to support these assumptions. Stated differently, although this might have been the case, Variety has not conclusively established that it was, leaving a genuine dispute of fact on this issue.

Variety also argues that when Martinsville renovated the roof in 2005, it was responsible for conducting a new drainage analysis. Accordingly, Variety contends that any negligence based on its predecessor in interest's installation of the parapet was extinguished, as a matter of law, by Martinsville's later failure to test and modify the drainage system when it refurbished the roof's surface. For this proposition, Variety points to Section 108.1 of the 2000 Virginia Uniform Statewide Building Code, which incorporated by reference the International Building Code 2000 ("IBC 200"). Section 1510.1 of the IBC 2000, in turn, requires that "more than 25 percent of the roof covering of any building shall not be removed and replaced within any 12-month period unless the entire roof covering is made to conform with the requirements for new roofing." Variety argues that this provision required Martinsville to analyze the drainage installed at the Rose's and make it "conform with the requirements for new roofing" as part of the 2005 renovation.

---

[8] Variety did not have a copy of the drawings in its files.

This is a misreading of the applicable law. Section 1510.1 requires that the roof *covering*, not the drainage, be made to conform with the requirements for new roofing. Section 1502 of the IBC 2000 defines a "roof covering" as "[t]he covering applied to the roof deck for weather resistance, fire classification, or appearance." On its face, this definition would not include drainage features like scuppers. Moreover, the IBC 2000 details the requirements for new roof coverings in Section 1507 and does not list any drainage requirements other than the slope at which certain coverings must be installed. These provisions, in sum, do not require a party who recovers a roof to also analyze and potentially overhaul the drainage on that roof.

Finally, Variety argues that Martinsville's obligation under the lease to maintain and repair the roof over the life of the lease negates any negligence by Variety associated with the initial parapet construction, and that Martinsville, if it had performed proper maintenance, would have discovered any drainage defects caused by the construction. But the evidence on this issue cuts both ways. Variety contends that obvious signs of drainage problems— including stains from standing water and cracks along the wall—existed for several years before the 2018 collapse, and that Martinsville should have taken steps to rectify the problem sooner. (ECF No. 82-64 at 50–54.) But there is evidence in the record that these signs and roof-maintenance issues encountered by Martinsville's contractors over the years were not indicative of anything other than routine problems of clogged drainage pipes caused by falling leaves and other debris, rather than material defects in the drainage system itself. Wijtenburg testified that the cracking could have multiple causes, some of which would not be indicative of a drainage problem. (*See* ECF No. 82-65 at 137–41.) Likewise, George Law, a Martinsville contractor who performed maintenance at the Rose's store, testified that the staining and

standing water were often the result of routine drain clogging or other environmental factors. (*See* ECF No. 82-62 at 46–47, 52–53.) In sum, there is a genuine issue of material fact on this issue.

Ultimately, Martinsville has adduced sufficient evidence to create a genuine issue of material fact as to whether: (1) Variety's predecessor in interest was responsible for the construction of the parapet wall around the time the lease was signed; (2) the parapet installation was defective in that Variety failed to modify or update the original drainage system to compensate for this structural change; and (3) these acts and omissions by Variety constitute a "defect caused by Tenant's neglect," as set forth in Section 8(d), excusing Martinsville from its obligation to indemnify Variety for damages associated with the roof collapse.

But while Martinsville has sufficiently established this theory for purposes of defeating Variety's motion for summary judgment on the indemnification claims, it is not entitled to summary judgment on this basis. Variety's evidence, as described in detail above, may be insufficient to entitle it to judgment as a matter of law, but it is more than sufficient to create genuine issues of material fact on the indemnification claim. A reasonable jury could conclude, for instance, that Martinsville approved or had sufficient notice of the parapet's construction in 1984, and/or that Martinsville's 2005 roof renovation excused any prior negligence on the part of Variety. The court will therefore also deny Martinsville's motion for summary judgment on this issue.[9]   Ultimately, there is sufficient evidence on both sides of this dispute, and a reasonable jury could find for either party on the issue of indemnification.

---

[9] Martinsville also briefly argues in its summary judgment filings that it need not indemnify Variety because the roof collapse was the result of historic rains, not any defect in the roof. (*See* ECF No. 93 at 15–17.) Martinsville does not explain, and the court cannot discern, how this argument helps Martinsville's case. The lease obligates

      iii.     <u>Breach of contract (worker's compensation benefits)</u>

As a final argument, Martinsville argues that Variety's breach of contract claim in the Amended Complaint (ECF No. 58) is brought as a subrogation action on behalf of Ms. Dillard, and that because Ms. Dillard was neither a party to nor an intended beneficiary of the lease between Martinsville and Variety, the claim fails as a matter of law. This argument misreads the Amended Complaint.

There is no doubt that Count One of the Amended Complaint—alleging a common-law negligence action—is brought as a subrogation action on behalf of Ms. Dillard: paragraph 14 plainly states that Variety "pursues this claim as Dillard's subrogee pursuant to Va. Code Ann. §§ 65.2-311 and 65.2-313." Count Two, however, does not contain any such language. Rather, it states that Variety was "damaged by its payment of worker's compensation benefits on behalf of Dillard." (Am. Compl. ¶ 19 [ECF No. 58].) Thus, on its face, Count Two is clearly *not* a subrogation action, and Martinsville's summary judgment argument must fail. Because it does not raise any argument why *Variety's* breach of contract claim in Count Two of the Amended Complaint is legally flawed or otherwise subject to summary judgment, the court will deny summary judgment as to Count Two of the Amended Complaint.[10]

---

Martinsville to indemnify Variety for damages caused by "any overflow or leakage or defect of exterior walls or roof . . . provided that such defect is not caused by Tenant's neglect." (ECF No. 93-1 at 11.) An overflow or leakage caused by historic rains is still an overflow or leakage. Thus, any argument that it was rain, not improper drainage, that caused the collapse is irrelevant to the indemnity issue.

[10] For the reasons discussed *infra* § III.A, Variety's negligence subrogation claim fails because Martinsville did not owe Variety's invitees—such as Ms. Dillard—and common-law duty with regard to the building it leased to Variety. Accordingly, summary judgment is appropriate on Count One of the Amended Complaint.

## IV.   CONCLUSION

The parties' motions for summary judgment will be granted in part and denied in part. Because Martinsville owed no common law duties to Variety or Dillard, its motion for summary judgment will be granted with respect to Variety's common law claims. Because Variety has not created any genuine issue of material fact with respect to whether new HVAC units were required to render Rose's Store #343 tenantable, Martinsville's motion for summary judgment will be granted on the HVAC claim as well.

Because Martinsville has waived any argument with respect to the affirmative defenses named in Variety's summary judgment motion, summary judgment will be granted to Variety on those defenses.

Finally, because genuine issues of material fact remain with respect to the cause of the roof collapse and the role of the parapet wall therein, summary judgment will be denied to both parties on the contractual claims related to the collapse.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 13th day of April, 2021.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE